The clerk called the next case please. Thank you. Is what Mr. Liber? Good morning. Good morning, Your Honor's counsel. May it please the court. I am Karen Weiberg. I'm here representing Terrence Claypool. And to kind of, I guess, cut right to the chase here, when Mr. Claypool was escorted to a police car by Officer Benoit and when Officer Benoit then initiated a frisk of Mr. Claypool, he was seized within the meaning of the Fourth Amendment. Because at that time, when that occurred, Officer Benoit had no articulable facts that would lead to a reasonable suspicion of both, A, that Mr. Claypool had been involved in or was about to be involved in any form of criminal activity, or B, well, actually more properly, and B, that he was actually armed and was in some manner a danger to Officer Benoit or someone else at that time. Because those things were lacking, this was a violation of the Fourth Amendment. Then, because Officer Benoit's conduct was, in taking that action, both intentional and purposeful, the drugs that were eventually found and which Mr. Claypool was convicted of possessing, that discovery was not purge of the taint of that initial illegal seizure. And therefore, those drugs should have been suppressed. Weren't they found after he took off running? Yes, they were, Your Honor. There was a struggle after Officer Benoit initiated the frisk. There was a struggle. Mr. Claypool slipped out of his coat and got away for a moment. Officer Benoit ran him down shortly thereafter and then the drugs came popping out. Doesn't that purge the taint of anything? No, Your Honor. Actually, I guess what this really comes down to is we get to people v. Henderson, the most recent Illinois Supreme Court case addressing this. And Henderson did hold, and as we acknowledged in our briefs, flight is an intervening event. Flight can play a role in attenuation and can attenuate a discovery of evidence from an initial illegal seizure. However, that's not the whole story. As the Illinois Supreme Court did in Henderson, we do have to perform the full three-factor analysis for attenuation. And that factor includes both the time between the initial seizure and the discovery of the evidence. It also includes a discussion, and this, what the U.S. Supreme Court has noted particularly, the purposefulness and the flagrancy of the police conduct involved in this action. Because, of course, when we talk about the exclusionary rule, one of the prime purposes of the exclusionary rule is to deter purposeful police conduct. Purposeful conduct intended to violate the Fourth Amendment for the purpose of trying to get evidence that you don't have a reasonable suspicion you're really going to find. It's a fishing expedition. And in this case, what we really have is a fishing expedition. And we know that for several reasons. We know that because, first off, there was so little that was even, I would say, remotely suspicious regarding Mr. Claypool's actions that Officer Benoit observed. And we know this from Officer Benoit's testimony. It was Officer Benoit who explains, well, yes, I saw a man trying the car doors. Well, what did that look like to you? It looked like a guy who was locked out of his car. I mean, this is not suspicious. This is somebody tried one car door. You didn't have somebody walking down the street, trying, you know, multiple doors, looking like he's trying to get into something. He attempted to enter one car, and he didn't break a window. He didn't do anything else. He tried the car, looked in it. According to Officer Benoit, he looked kind of confused, looked around, and then he walked away. And he walked away a short distance, and Officer Benoit, who had been approaching to offer him assistance, sees him walking away and then calls out to him and says, hey, hold on a second. I think those were his words. Hold on a second or hold on. And at that point, Mr. Claypool slips and falls on some ice. Now, Officer Benoit testified that it looked to him like Mr. Claypool was getting ready to run. He was leaning forward as if he was going to run. Now, I would submit that there are a lot of reasons why you might see a leaning motion while somebody's in the process of slipping and falling on some ice. I mean, you're trying to catch your balance. There's all sorts of things happening. However, even accepting, and I think this is where we really hit the crucial moment in this encounter, even accepting that maybe there was something suspicious about this motion that led to this fall, what happens after that immediately dispels that suspicion. What happens? And again, we have Officer Benoit telling us, well, he started to get up. He slipped, he fell, he started to get up. Okay, was he scrambling? Was he moving quickly, trying to get up, trying to run away? No, he was just trying to get up. Officer Benoit got over, helped him up. Did he do anything threatening, hostile? Did he try to break away? No, just helped him up. And Officer Benoit at that point took what I would call a fairly reasonable action, asked him a question. Were you trying to run from me? Answer, no, I just slipped. I slipped on some ice. And when counsel asked, you know, Officer Benoit, was that a reasonable explanation? Yeah, that was a reasonable explanation for that action. So at that point, even if you had some, I would call it a fairly vague suspicion based on a lean, but even if that lean gave you some vague suspicion, hey, something's not right here, you ask the question, you got what you yourself admit was a reasonable answer. Now, notably, at this point, there has not been any notice of any kind of hostile activity. No suspicious bulges in the clothing, nothing that would lead any reasonable person to presume the presence of a weapon. And yet, having just received a reasonable answer to the one question he asked,  Officer Benoit chooses at that point to escort Mr. Claypool to his car and perform a frisk. So we submit that there was never reasonable suspicion for a stop in the first place. Even granting that there could have been some basis for a stop, at this point you have nothing to suggest that this individual is armed and dangerous. You have nothing. And yet you walk him over and you initiate a frisk immediately. And there's really only one reason you do that, and you do that because you're fishing for evidence. You do that because you stopped a guy, it's late at night, and you thought, well, I've got him, let's pat him down, let's see if we find anything. And that is precisely what the Fourth Amendment does not allow for. It does not allow these fishing expeditions. It does not allow you to stop a man based on an inarticulate hunch. And go fishing for evidence. That's what Officer Benoit did. And that falls under the definition of flagrant misconduct. It's a purposeful decision to violate our client's Fourth Amendment rights in the hopes that you'll come up with some evidence. And that is precisely what separates this case from People v. Henderson. People v. Henderson was a vehicle search. You had a report of a deadly weapon. You had a report that somebody had a gun in this car. And it's a car. You don't have any other options to investigate this. You either stop the car or you don't. There's no other way to find out about this gun. So the officer stopped the car, and the guy took off running, drops a gun. Well, the Supreme Court says that was a close call. The Supreme Court was ultimately persuaded, yes, this was probably not a justified stop. But it's a close call. We don't have anything like flagrant conduct here. Officers made a good faith mistake. What we have in this case is completely different. And what's particularly noticeable here is what Officer Benoit did not do. You've held Mr. Claypool to his feet. You've asked him a question. He's not hostile. He's not running. He's not doing anything. You asked him, were you trying to run from me? No. What is the next logical step? You can either terminate the encounter and say, okay, well, I guess I thought that was suspicious. I guess it's not. That's a reasonable answer. Or you can ask another question. Oh, hey, is that your car back there? Do you live around here? Where are you going? Literally, I think it took me five seconds to articulate those three questions. That could have either served to further completely dispel any suspicion you had, and you let this man go on his way. Or maybe he does something suspicious. Maybe he says something suspicious. In which case, now maybe you have better reason to go forward with further action. But he didn't do any of those things. Officer Benoit simply took this man with no evidence that he was armed, no indication, and started to frisk him. And in that respect, this case is actually quite similar to People v. Porter, which this court decided not too long ago. Where again, in that case, they actually found that there was some basis for suspicion. The suspect had been walking away from the area of a home invasion, and I guess he was walking in an area where you don't normally see pedestrians. But when they approached him, they called to him, he complied, he walked over. Officer immediately seizes him to go to frisk him. And this court held, under those circumstances, you just don't have any reason at this point to believe that there is a dangerous weapon involved. And the right to frisk does not follow the right to stop. It takes more. And so when we talk about Henderson and we talk about flight attenuating, flight does attenuate. But it's really only one part of the analysis. In Terry v. Ohio, what was the evidence that the officer had that the fellow was armed? What was the evidence that made you think he had a gun? In Terry v. Ohio, I believe it was they had witnessed several, they had witnessed him essentially casing a location and observing, you know, a gun back. There had been a lot of back and forth observing, and it looked like they were preparing for a robbery. But what suggested that he had the man he had stopped, Mr. Terry, had a gun on? Well, it's been a little while since I read all the way through, Terry. My recollection is that most of that suspicion was based upon the nature of preparing to engage in a robbery of a business. And, I mean, you're talking about a business that's open. There's really only one way to rob a business, and that's with a weapon. I mean, it's pretty hard to do it unarmed. Which is, and therefore, in that case, the fact that you are suspecting that, in essence, a business robbery is about to take place here, in and of itself suggests the presence of a weapon. In the present case, at most, the officer had some vague suspicion that Mr. Claypool might have been trying to break into a car. And the officer said, well, then I thought he might have had burglary tools. And I guess some of those could be used as a weapon. Maybe a screwdriver or a crowbar or something like that. But, notably, first of all, he tried the handles on a car, and then he walked away. He didn't have a screwdriver. He didn't take out a screwdriver and stick it in the lock. He didn't take out a Slim Jim and try to pop the lock. He didn't take a crowbar and bust the window. He walked away. So, presumably, if he was trying to break into a car, and he had some kind of item, well, then, presumably, he would have used it. Which he didn't. More importantly, and the Illinois Supreme Court has been very clear about this, you can't simply presume, because you think somebody might have been involved in some kind of a theft or some kind of a burglary, what is not an inherently violent offense, you can't just assume, based on that offense, that that person is, therefore, armed and dangerous. And that's in People v. Gelbin. Thank you. Which is very clear on that topic. So, I would say, when we get down to the fruit of the poisonous tree here, and that's what we're really talking about, yes, we have an intervening event in flight, and that does, we acknowledge, that is somewhat attenuating, but that doesn't end the analysis. The time was very close. It was virtually immediate from when the seizure occurred to when the drugs were captured. Well, wouldn't flight, by its very nature, always be immediate? I mean... Oh, flight will be immediate, no. I mean, if he goes home and then runs somewhere, he's not fleeing. I mean, flight, by its nature, is right down there. Right, and to clarify what I mean by that, in terms of the distance of time between when the evidence was discovered and the initial illegal seizure, was a very short period of time. It's not like he got away and somebody picked him up four blocks later, five minutes later, and somebody found him and they got the evidence. This was immediate. It was, he broke away, the officer chased him, he was never out of sight, officer shoved him to the ground, coke comes out. So, I mean, it was immediate, so the temporal proximity is very small. And really, the most important factor here is that the issue of the police conduct, because that's what the exclusionary rule is all about. The exclusionary rule is all about deterring the police from engaging in these fishing expeditions that violate citizens' Fourth Amendment rights, just in the hopes that they'll be able to come up with something. I believe it was the Ninth Circuit, or possibly the Sixth Circuit, held in Wilson, noticed, noted that allowing this kind of evidence in is in essence incentivizing police to engage in provocative stops in the hopes that you'll find something and then you'll find some way to justify it. Maybe you'll scare the guy and he will run. And then after that, it's free game. You can do what you like. And the notion is, when you had no basis to stop, and it was clearly a fishing expedition, at that point, the intentionality of the police conduct is what really renders the evidence in this case inadmissible. And it should have been suppressed, and had it been suppressed, Mr. Claypool simply couldn't have been convicted of any offense here. So if there are no further questions... Are there? Step down. Okay, thank you, Mr. Weiberg. Mr. Arado, good morning. Good morning. May it please the Court, good morning, Your Honors, counsel. The evidence in this case gives rise to reasonable suspicion based on the totality of the circumstances. Counsel suggests that, well, this was innocent conduct, well, this was innocent conduct, well, this other thing was innocent conduct. You take it as a whole. What did the officer see? He saw, at 12.48 a.m., an individual is at a car. He's trying the handles on the door, he's trying the trunk of the vehicle, he is looking around, and then he proceeds to walk away towards a house. And Bernoulli says, okay, you know, that's a little unusual, perhaps he's locked the keys out, he's going back to the house, but then he proceeds past the house, and he says, well, that's unusual, that raises my suspicion, I should at least talk to him. So he stops his vehicle, and then he testifies, he observes that it appears to be that the defendant runs, or attempts to run, but slips and falls on the ice. Now, the explanation is, from the defendant, supposedly, oh, I wasn't trying to run. Now, two things. First, the officer's not required to accept the explanation of the defendant. His observation was, hey, it looks to me like he's trying to run, he can believe that he was trying to run. Second, Officer Bernoulli did not testify it was a reasonable response, he said it was a plausible response that he simply slipped on the ice and wasn't trying to run. There's a difference between reasonable and plausible. As I note in my brief, the definition suggests that it's at least a possibility, not necessarily likely that you have to believe that. So, at that juncture, there is at least reasonable suspicion that criminal activity is going on, and so he helps the defendant up, escorts him back to the vehicle, does not immediately engage in a frisk. He asks him to put his hands on the vehicle. Doesn't, at that point, other than helping him up, there's no testimony that while he escorted him, he held on to the vehicle, at least not the call. But he asks him to put his hands on the vehicle. Instead of putting his hands on the vehicle, he puts one hand on the vehicle and goes and puts the other hand to the waistband. And at that point, Officer Benoist says, whoa, waistband, I think you might be going for something. And then he tells him, well, put your other hand up on the car. Instead, he takes his right hand and puts it to the waistband, and at that point, Benoist says, well, I think he's going for a gun, jumps him to try and pin him down and stop him, so it is defendant's conduct that causes the reaction of Benoist to try and pin him down during the pursuit that the cocaine comes out. With his reaction, what are you talking about in terms of his reaction when he's trying to pin him down? The defendant's actions in putting his hands to his waistband caused Officer Benoist to try to seize, physically, to pin him down in order to stop him from going for whatever it is. It was definitely a furtive movement that suggested potential dangers by the defendant. It's 1248 in the morning. He's the only officer there. He's got an interest in officer safety, and his testimony, I understand what the counsel is saying about the mere fact that it doesn't necessarily mean that you have a weapon that was stated by the Supreme Court, though in other cases, in McGowan, I believe, they suggested otherwise, but that was an earlier case. I understand that. What's the crime here? The crime, reasonable suspicion of attempted burglary into a vehicle, I believe is the initial crime. How did he attempt burglary? Simple. He tried to go in. If the vehicle is unlocked, it's not your vehicle, you open it, and you go into it, that is with the intent to take something out of it. That is a what? Right. But he didn't do that. It wasn't unlocked. He didn't go into it. That's why it's an attempt. Okay, but he tried the door things. He couldn't get in. He didn't do anything else. He was away from the car at the time the officer was following him. Yes. I'm sorry, I'm not seeing the crime. It's reasonable suspicion of criminal activity of attempted burglary into a vehicle. Did Terry go in the jewelry store in Ohio? Honestly, again, I think he was walking across the street, walking back toward me. You know, we cited... I mean, that's a reasonable suspicion of probable cause, right? Something just isn't right here, as opposed to evidence that he committed a crime. If he had committed a crime, then we wouldn't be here to have probable cause. If he had opened the vehicle and started walking away, after looking around furtively, the officer stops him and says, is that your vehicle? The officer has a right to engage in discussion with citizens. There's no requirement that he has to let him wander off. Okay, just one more second. In Terry, what the police officer did stopped what he thought was going to be a burglary. He thought somebody was going to rob the store, and he stepped in because he was going to stop it. In our case, the guy tried the doors, and then he walked off. The officer's action wasn't stopping anything. No, he was investigating an attempt that had already been committed. Which, at the time it was happening, he didn't think was an attempt. He was not suspicious when it was going on. But, that doesn't necessarily mean that later he can't develop... But, we've still got to get to reasonableness. I think what he said, the officer testified what he thought the actions of the defendant were. Right? Correct. At the time he observed those actions. Right? Correct. Were any of those articulable criminal actions? Or was it... Isn't the testimony I thought he locked himself out of his car? That was his initial... Initial. Did he say anything else at that point in time? Of his observations? Explaining what his observations, what his inference was. No, but it's the further conduct of the defendant. Walking down the street? Well, it's the method of two things. First, he was walking towards a house and avoided that house. And then when he saw the officer, he changed directions. Which suggested, again, more suspicion to the officer. What you're suggesting, Your Honor, is if you see conduct which you initially think is... Innocent conduct. Innocent conduct. But you see, later see conduct that reinforces or changes your mind. You can't investigate that. Did he change his mind? Is there testimony he changed his mind? Yes, he did. When did he change his mind? Was this an attempt burglary? When did he articulate that? He articulated that he had reasonable suspicion of criminal activity after he changed, particularly after he changed directions after seeing him. That's why he went to talk to him. That's why... And then, I'm sorry, Your Honor. No, go ahead. I'm sorry. And then when he slipped and fell after appearing to want to run away, that reinforced for the officer that this is something I really need to check out. And this is the type of conduct I think... Attempting to run away. Okay, so the attempt to run away was I see an officer and I change directions and continue walking the other way? No, no. And then when officer Benoit said, hey, can I talk to you? That's when he attempted to run and slipped and fell. So there's a series of events that are taking place that as they progress it creates greater suspicion in officer Benoit. So, but for the eyes he would have been running away. Correct. Is what we're to assume. Correct. Did he come back to go down the alley? Or did he just turn when he got to the intersection of the alley? All I recall is that Benoit said he changed directions at the alley. I do not recall the specifics of which direction he was... It's not a brief as far as which what officer Benoit testified. But I don't recall if he was... He got to an alley and then when he turned back and saw Benoit he then instead of moving straight forward he then veered off. Did officer Benoit call to him after he went into the alley or before? I believe it was after because he said hey, after he saw Benoit Benoit testified he saw me and then he changed directions and I drove up stepped out of the vehicle said hey can you can I talk to you and then asked for a defender. Okay, and I guess what I'm asking you is what's the factual basis for he changed direction? Was he clearly going forward down the street and he came back and he went into the alley or did he just get to the intersection of the alley and the street  I don't understand changed direction. All I can tell you is what officer Benoit testified that was a change of direction. There was no detail in his testimony about what that meant. I don't recall if he specifically said he was at the alley and then I know that he said he was at the alley and changed directions but I couldn't tell you I don't honestly Sure. The record's the record. I shouldn't perhaps Well it may not be in the record I mean we have the record we can check that. But regardless you know this isn't a fishing expedition as counsel puts it. When he has him at this he has at least some suspicion reasonable articulate suspicion that activity is going on puts his hands fails to put his hands on the vehicle and says put them on the waistband. At that point there is an attenuation between even if this is you know a legal seizure if you will Henderson applies now there's no When in the point of time does the seizure occur of the defendant? Well that is an interesting question certainly is it when he helps him up I don't if you want to pinpoint it I would say that he's escorting him back to the vehicle the defendant is not free to leave at that point. And he didn't he didn't frisk him prior to getting him back to the police car right? That is correct. In the alley he was not worried enough about anything to frisk him. Well he was escorting him presumably he was right next to him so when he got to the vehicle he felt necessary that if he's going to continue talking to him that he should be concerned about his own safety given the circumstances. But the attenuation there's three factors that the Supreme Court puts out the time the presence of intervening circumstances and the purpose and frequency of the official conduct what we're focusing on really is the third factor. There's no dispute about the time I mean it was very close in time as far as the intervening factors that is also there. So really the flagrancy and that goes to whether it was done that would cause surprise, fear and confusion saying hey can I talk to you that's not going to cause surprise, fear and confusion and whether the quality of the conduct was purposeful or intentional misconduct. He's just trying to figure out whether the defendant is involved in trying to break into a vehicle or not and there's nothing flagrant about what  trying to do. I think that conduct that the Supreme Court is going to say is a flagrant violation of the rights at the point that attenuation would not apply. So his articulable suspicion of criminal activity obviously his testimony wasn't when he saw the guy touch the car or whatever. It was when? It was after he started walking away and then walked past the house that he said, hey, well, there's an isolated vehicle, there's no other vehicles around. There's a house, apparently only a house that is nearby. So the vehicle is close by. Well, nearby. If he goes to the house, well, it must be his car. Since he went past the house, hey, maybe this isn't his car. So his mind has changed at that point. It's not a simple saying, oh, okay, at this point in time, I'm not going to investigate anything. If his initial reaction is, oh, well, that must be innocent. Okay, so you're saying you're not limited to the initial reaction. But what if there are other explanations that are not criminal explanations for that action? Well, it's... Then does that go to reasonableness? It might go to reasonableness if the circumstances suggest that the answers are truthful. And here,  question that got out was, were you trying to run? So, really, what we got, okay, because there are a couple other explanations. Okay. Sure. It's not my car. I was confused. It could have been my car. I'm a homeless person. I want to sleep somewhere. It's cold at night. But the case law has pointed out, just the mere fact you have reasonable explanations doesn't necessarily mean that the officer has to accept them when he's doing his investigation. I'm talking about when can the officer investigate? When he sees conduct which he believes is suspicious. Right. But now, the point of it is, okay, so it's sufficient. So how do we judge whether it's suspicious of a criminal act or set of acts when there's possible other explanations that are innocent explanations? He only needs one. See, because now his investigation seems on all of these things, investigation just seems to be seizure. That's because he hadn't got to the point where he was, he says, well, it's taking five seconds. Well, officer testified that truthfully there was no time for him to ask those questions between the time he helped him up and got into the squad car. So, was there a seizure when he escorted him over? Well, yes. But he was going to ask those questions, and if he had gotten the answers to the questions of it's not my car, it's not, or it is my car, or whatever the innocent explanations  what counsel was suggesting is, well, we can infer possible innocent explanations. The officer never got to that point. Well, no, he never got to that point. Not necessarily. Obviously, he didn't in this case. No, because he seized him and taken him for a pat-down. He's not investigating at that point, is he really? I mean, we've gone beyond the step of investigation. We've gone to a point where we are, he is reaching out to him, he wants to talk to him by the squad car, escort him over, reasonable circumstances, time of day, he wants to be close to the squad car for safety reasons, whatever. We want to, he is then going to talk to him further. Yes, maybe it is after the pat-down. Maybe that would have been a seizure, but he didn't actually frisk him down. He said, put your hands on the vehicle. He doesn't actually do the pat-down at that point, but he doesn't even comply with the officer at that point. He puts his hand in his waistband, then he puts his other hand in the waistband. And then we have the attenuation of the struggle. And really, even if we have a problem with the seizure, it's the attenuation that preserves our evidence of the cocaine and the conviction. Just out of curiosity, was Mr. Claypool charged with attempted burglary? I don't believe so, no. But that's often the case. Mr. Weiberg, rebuttal. I have several things I'd like to address regarding that. Let me answer your question first. Imagine, if you will, it's the middle of night, and you're out there and you tell a fellow to put his hands on the car, you and him. And instead of putting his hands on the car, he goes to his waistband. You think that might fucker you up a little bit? Well, I think so, but I think the more important question is, why on earth did you have this guy putting his hands up on the car so you could frisk him in the first place? I'm going to stop this fellow. I'm going to order this fellow to stop because I don't like his tie, and there's clearly no basis for it. And yet, in the process of it, that fellow does something, threatening to the police officer. The police officer   threatening to the police officer. In other words, does that break the causal connection? Just because a police officer, even if it's a clearly illegal stop, you can't make threatening gestures to a policeman. Well, your Honor, I would say, first of all, that question has already been answered by this court. People v. Porter, the officer put his hand on the suspect in order to put a frisk on him, and the suspect struggled. And this court found that under those circumstances, the evidence needed to determine whether the evidence that is a direct result of his illegal action in detaining this person in the first place should later be allowed in a court of law to support a conviction. You might have had a resisting arrest conviction here, but should you have a conviction for drugs that were only discovered because this officer decided to go on a fishing expedition and try to frisk someone that he didn't have reasonable suspicion of? And I'd like to address just a few of the points that were up there. No, he was not brought to the car to talk. He was not brought  car to talk. You do the pat down before the talking so you can be much more relaxed during the conversation. You don't have this good long conversation and then pat somebody down. That doesn't make any sense. Well, that would certainly be true if you had some evidence that this individual was armed and dangerous. But in this case, even now, I did not hear the state articulate a single reason other than a reference to People v. McGowan, which People v. Galvin, the later case, pretty clearly said you cannot just turn to McGowan to justify a search any time you suspect someone of activity. There has never been any suggestion of what Mr. Claypool, what sign there was that he was armed and dangerous. He hadn't done anything hostile. He hadn't shown any suspicious bulges. He didn't pull out a crowbar at the car. He tried the handles and he walked away. And in order to justify the danger of some form, the suspicion that this person is armed, I would like to address just a couple of things factually. Your Honor was asking about the change of direction and what that meant. What Officer Benoit testified to specifically was he changed direction a little bit and kind of angled northeast bound. Now that to me does not describe a sharp evasive move. And as I think it was the Second District noted, you're always free to walk away from the police until they take some action to detain you. That's every citizen's right. It's not suspicious. The man probably just wanted to turn down the alley. But whether he wanted to do that because he doesn't like police officers or because where he was going was down the alley, that's not a  suspicion. So that, in and of itself, there was some discussion of the fact that this was late at night. I would note this was Saturday night. This was not, you know, a Tuesday in a rural area. This was Saturday night in a residential area. It's not unusual for someone to be out shortly before 1 a.m. on Saturday night. Similarly, the fact that he walked past the house, I mean, I can't speak for everyone, but I certainly often park several houses away from my home. Or, again, it might have been a mistake as to what car it was. Or, if you locked your keys in the car, you might have locked your house key in there, too. I mean, of course, just the fact that you can think of an innocent explanation is not sufficient to discuss it. There was never any testimony on that subject. But he was not charged with attempted fraud. I'd like you to finish your sentence. Just because there is an innocent, what were you going to say? Well, what I was going to say is that certainly, just because there's an innocent explanation, that alone does not eliminate the possibility of reasonable suspicion. But where the number of innocent explanations and the number of perfectly reasonable explanations, and I would note, though the officer did say plausible, counsel asked, was that a reasonable explanation? And Officer Benoit said yes. So reasonable was used. But where you have infinitely more innocent explanations for an action than perhaps one suspicious one, at that point, that strongly suggests that it's simply not reasonable to find that suspicious. So, your honors, based on all that, because Officer Benoit's actions were flagrant and were a fishing expedition to attempt to get evidence for some unknown crime, the drugs that were eventually seized from Mr. Claypool as a direct result of that should have been suppressed, and because his conviction cannot be proven without those drugs, Mr. Claypool's conviction should be reversed. Thank you very much. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in   Claypool.